**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BARBARA A. DALE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12 C 9316** |
| | ) | |
| **vs.** | ) | **Honorable Michael T. Mason** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Barbara A. Dale has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") to deny her claim for Disability Insurance Benefits and Supplemental Security Income.  The Commissioner has filed a cross-motion for summary judgment asking the Court to uphold her decision, and that of the Administrative Law Judge ("ALJ").  This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g), and 1383(c).  For the reasons set forth below, Dale's motion for summary judgment [19] is denied, and the Commissioner's motion [23] is granted.

**Background**

**A.  Procedural History**

Barbara Dale filed applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") on May 26, 2010, alleging disability beginning April 12, 2009.  The Commissioner denied all claims initially on July 27, 2010, and again upon reconsideration on November 1, 2010.  Dale requested a hearing before an Administrative Law Judge on December 3, 2010, and the case was assigned to ALJ

Denise McDuffie Martin, who held the requested hearing on November 13, 2011.  Dale, Vocational Expert Michelle Peters, and Medical Expert Dr. Ellen Rozenfeld testified at the hearing.  (R. at 43.)  ALJ Martin issued a written decision on December 7, 2011, denying Dale's request for benefits.  (R. at 38.)  The ALJ found that Dale had not been under disability as defined by the Act from April 12, 2009 through the date of the decision.  (R. at 38.)  The Appeals Council denied Dale's request for review on October 15, 2012, and the ALJ's decision became the final decision of the Commissioner (R. at 1.); *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir.1998).  Dale subsequently filed this action in the district court, seeking review of the ALJ's (and the Commissioner's) decision.

**B.  Medical Evidence**

The medical evidence in the record shows that, on August 25, 2005, Dale saw a clinician at Loretto Hospital for a Mental Health Assessment and Psychiatric Assessment.  (R. at 395.)  The clinician reported that Dale appeared depressed, anxious, angry, irritable and isolated.  (R. at 397.)  The clinician further indicated that Dale had an organized thought process and fair impulse control.  (R. at 398.)  Dale perceived her family as supportive and wanted her family involved in her treatment.  (R. at 399.)  The clinician diagnosed Dale with adjustment disorder with anxiety and depressed mood and assigned her a 60 on the Global Assessment of Functioning scale, the highest score in a range indicating "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  (R. at 409; Global Assessment of Functioning (GAF) Scale, DSM-IV, p. 34.)

Dale saw Dr. Rachel Zahn on March 3, 2008 for a Behavioral Health Consultation.  (R. at 537.)  Dale reported stress from working 12 hour shifts four-days a week, full-time school three days a week, and recent identity theft.   (R. at 537.)  Dr. Zahn recommended working on small goals and setting weekly tasks.  (R. at 537.)  Dr. Zahn diagnosed Dale with adjustment disorder.  (R. at 538.)

On March 25, 2008, Dale saw Dr. Zahn for a Behavioral Health Consultation follow-up and guided imagery.  (R. at 535.)  Dale reported recollections of the death of her mother and PTSD.  However, Dale stated that she would utilize guided imagery to find a safe place to re-energize her day.  (R. at 535.)  Dr. Zahn diagnosed Dale with adjustment disorder.  (R. at 535.)

Dale received a Behavioral Health Consultation with Dr. Michael Hansen on July 17, 2008.  (R. at 533.)  Dale reported improved symptoms and that her grieving had progressed.  (R. at 533.)  Dr. Hansen diagnosed Dale with adjustment disorder.  (R. at 533.)

On August 22, 2008, Dale called Registered Nurse Annie Bryan to report headaches and to request a CT scan.  (R. at 530.)

Dr. Hansen saw Dale on September 19, 2008 for another Behavioral Health Consultation.  (R. at 527.)  At that time, Dale reported improved symptoms.  (R. at 527.)  She also reported reduced school load and less stress.  (R. at 527.)  Dale reported a decrease in the intensity of her pain and reported that praying had helped her get answers.  (R. at 527.)  Dr. Hansen diagnosed Dale with hypertension, adjustment disorder and bereavement.  (R. at  527.)

Dr. Bolanie Soyannwo saw Dale on December 3, 2008 for an acute visit. (R. at 518.) At that time, Dale reported right side headaches for the past 2-3 months. (R. at 518.) Dale stated that she had difficulty working due to headaches and occasional nausea. (R. at 518.) Dr. Soyannwo diagnosed Dale with common migraines and adjustment disorder. (R. at 519-20.) She prescribed Excedrin Migraine and Verapamil. (R. at 520.) On December 22, 2008, Dr. Soyannwo took Dale's labs. (R. at 513.)

Dr. Karla Torres conducted a Behavioral Health Consultation with Dale on February 3, 2009. (R. at 511.) Dale reported worse headaches because of remembering losses from the past. (R. at 511.) Dale stated that she noticed a connection between worrying and anxiety with her headaches. (R. at 511.) Dr. Torres diagnosed Dale with Hypertension, Common Migraines, and Adjustment Disorder. (R. at 511-12.) She advised Dale to implement "diaphragmatic breathing and progressive muscle relaxation for muscle tension and worrying that exacerbates headaches." (R. at 511.)

On February 20, 2009, Dale saw Physician's Assistant William Bush for headaches. (R. at 509.) Dale reported headaches almost daily for a whole week. (R. at 509.) She stated that she had been unable to work more than two days during the past two weeks and had blurred vision. (R. at 509.) Physician's Assistant Bush diagnosed Dale with common migraines. (R. at 510.)

Dale saw Dr. Jewel Scott on February 24, 2009 for a regular check-up. (R. at 506.) Dale reported more frequent headaches due to her 4am-11am shift work at the airport. (R. at 506.) Dale believed her work schedule interrupted her sleep schedule

and caused her headaches.  (R. at 506.)  Dr. Scott diagnosed Dale with common migraines.  (R. at 508.)

Dale saw Physician's Assistant Bush again on March 20, 2009.  (R. at 504.) Dale reported headaches, which she described as "sharp." (R. at 504.)  She reported that she had similar headaches as early as the 1980s, but had not had one recently, until the past year.  (R. at 504.)  Bush recommended Dale follow-up with an optometrist, and continue taking Excedrin.  (R. at 505.)

On March 24, 2009, Dr. Scott saw Dale for follow-up regarding her headaches. (R. at 499.)  Dale reported her pain at the time of the appointment as a 0 out of 10.  (R. at 499.)  Dale requested a letter for work because of her tardiness associated with her headaches.  (R. at 499.)  Dr. Scott wrote a letter on Dale's behalf stating that she suffered from headaches, possibly due to her lack of sleep stemming from her assigned shift work.  (R. at 498.)

Dale received a brain CT scan on March 28, 2009.  (R. at 497.)  The CT scan was normal and no intracranial abnormalities were identified.  (R. at 497.)

On April 14, 2009, Dale saw Dr. Scott for another follow-up.  (R. at 299.)  At that time, she reported that she continued to have headaches, decreased concentration, and decreased ability to focus.  (R. at 299.)  Dr. Scott noted Dale appeared to have a depressed affect.  (R. at 300.)  Dr. Scott diagnosed Dale with common migraines.  (R. at 300.)

Dr. Scott saw Dale on April 15, 2009.  (R. at 295.)  On the same day, Dale had a Behavioral Health Consultation follow-up with Dr. Zahn.  (R. at 296.)  Dale stated that she continued to have migraines and discussed recollections of past abuse.  (R. at

296.)  Dale reported having strong feelings toward a man and realized that her husband was never there for her when she was sick.  (R. at 296.)  Dr. Zahn encouraged Dale to keep journaling and diagnosed Dale with common migraines and adjustment disorder.  (R. at 296-97.)

On April 30, 2009, Dale saw Dr. Hansen for a Behavioral Health Consultation follow-up.  (R. at 294.)  She reported that her symptoms had improved.  (R. at 294.)

Dale arrived for a follow-up with Dr. Scott on May 12, 2009.  (R. at 289.)  Dale's chief complaint was for headaches that became worse when she touched the temporal area.  (R. at 289.)  Dale reported that relaxation techniques helped a little to alleviate pain.  (R. at 289.)  She also reported a better mood and better ability to organize thoughts and concentrate.  (R. at 289.)  Dale stated that her employer fired her for frequent absences but stated she felt better since resuming a normal schedule as opposed to shift work.  (R. at 289.)  Dr. Scott diagnosed Dale with common migraines.  (R. at 290.)

On June 23, 2009, Dale saw Dr. Scott for a follow-up regarding depression and headaches.  (R. at 286.)  Dale reported significant relief in headaches with Cymbalta.  (R. at 286.)  However, Dale reported worse depression, sad feelings, and an inability to get out of bed for several days.  (R. at 286.)  Dale reported that her brother had died 2 weeks earlier and that she was able to get the energy to go to the funeral and felt better being with family.  (R. at 286.)  Dr. Scott diagnosed Dale with depressive disorder and common migraines.  (R. at 287.)

On the same day, Dale saw Dr. Zahn for a Behavioral Health Consultation.  (R. at 474.)  Dale reported experiencing emotional pain and wanting to remain in bed; she

also reported that she had cancelled several doctors' appointments.  (R. at 475.)  Dr. Zahn encouraged Dale to journal her thoughts and feelings and to follow-up for support.  (R. at 475.)  Dr. Zahn diagnosed Dale with depressive disorder and common migraines.  (R. at 476.)

On July 28, 2009, Dale had a follow-up visit with Dr. Scott for a rash on her upper thighs.  (R. at 279.)  Dale reported that she was not doing well, had missed several days of classes due to lack of energy and continued to grieve the loss of her brother.  (R. at 279.)  Dale reported that she was going through a divorce, and that she experienced more "emotional pain" dealing with the memories of her cousin molesting and raping her as a child.  (R. at 283.)  She reported that her migraines began improving with Cymbalta.  (R. at 280.)  Dr. Scott diagnosed Dale with depressive disorder and common migraines.  (R. at 280.)

That same day, Dale also saw Dr. Torres for a Behavioral Health Consultation follow-up for bereavement and depression.  (R. at 468.)  Dale reported depression, trouble falling asleep/sleeping too much, and feeling tired/having little energy for several days.  (R. at 468.)  She also reported having trouble concentrating and having suicidal thoughts.  (R. at 468.)  However, she also reported that, overall, she felt better.  (R. at 468.)  Dr. Torres reported that Dale was mildly depressed, but did not have any suicidal plan or intent.  (R. at 468-69.)

Dr. Scott saw Dale on December 14, 2009 for a follow-up visit.  (R. at 272.)  Dale reported headaches, but a better mood.  (R. at 272.)  Dale reported that she continued to remain at home and that she had gained 28 pounds.  (R. at 272.)  Dr. Scott noted that her depression and headaches seemed to be improving.  Dale told Dr. Scott that

she journalled as a way to process the death of her brother.  (R. at 276.)  Dr. Scott concluded that Dale suffered from passive suicidal ideation, but did not have suicidal plans or an intent to harm herself.  (R. at 276-77.)

On April 19, 2010, Dale saw Dr. Torres for a Behavior Health Consultation and for a follow-up regarding depression.  (R. at 256.)  Dale reported increased symptoms related to confronting past abuse and grief.  She remained hopeful and reported progress as she felt more able to tolerate dealing with grief versus avoidance.  (R. at 256.)  Dale restarted Cymbalta for her depression.  (R. at 256.)  She implemented relaxation and 10-15 minutes of daily exercise into her daily regimen.  (R. at 256.)

Dale also saw Dr. Scott on April 19, 2010 for a routine check-up.  At that time, she reported feeling as if her depression had returned, that she had no energy to leave the house and that she felt as though something "heavy [was] bearing down" on her. (R. at 259.)  Dr. Scott recommended she continue to exercise daily.  (R. at 261.)  Dr. Scott diagnosed Dale with hypertension and depressive disorder (R. at 453-54.)

Dr. Scott saw Dale on June 5, 2010 for her annual physical and Pap smear. Dale reported that she continued to suffer from depression, but had more energy.  (R. at 244.)  She reported clearer thoughts, but also reported that she still found it hard to focus and had a shorter attention span.  (R. at 244.)  Dr. Scott diagnosed Dale with depressive disorder, common migraines, and hypertension.  (R. at 440.)

On June 24, 2010 Dr. David Miller saw Dale for a follow-up visit.  (R. at 325.) Dale complained of headaches sharp in quality.  Dr. Miller found that Dale had abnormal Thyroid Stimulating Hormone and chronic anemia.  (R. at 325-26.)

On August 17, 2010, Dale completed a Disability Report. (R. at 174.) In it, she reported an onset date of April 12, 2009 for depression and migraines. (R. at 176.) Dale stated that she could take care of her own personal needs and that her children helped her clean and cook. (R. at 184.)

On September 9, 2010, Dale completed a Function Report. (R. at 201.) She reported an inability to focus, occasional severe migraines, and slowness in processing information. (R. at 191.) Dale stated that she starts her day around 3:30 or 4:00pm. (R. at 192.) She stated that she gets up, washes up, and sits for a while to collect her thoughts. (R. at 192.) She then eats fruit or something quick to fix, and then watches T.V. or plays p.c. games, talks to her children, takes her medication and then goes back to bed around 12:30 or 1:00 a.m. (R. at 192.) She reported that she does not need any help with personal care and that she does not prepare her own meals. (R. at 192-93.) Dale further reported that she goes outside occasionally and when she does, she walks or uses public transportation and is able to go out alone. (R. at 194.) Dale reported an ability to pay her bills, count change, handle a savings account, and use a checkbook. (R. at 194.) Dale also reported that she talks on the phone with family and friends and that she does not need anyone to accompany her. (R. at 195.) However, Dale stated that she does not always understand what is being said to her and that she has short term memory issues that prevent her from remembering the task at hand. (R. at 196.)

Dale saw Dr. Ana Gil for a Psychiatric Examination on October 4, 2010. (R. at 373.) The Psychiatrist found that Dale was able to dress, groom and care for herself and her own personal hygiene. (R. at 373.) Dr. Gil found that Dale does this every two to three days. (R. at 373.) Dr. Gil also noted that Dale could take public transportation

on her own.  (R. at 373.)  Further, Dale's children generally do the laundry, grocery

shop, and do dishes, though Dale sometimes does the dishes.  (R. at 373.)  Dale stated

that she could pay the bills, handle a savings and a checking account.  (R. at 388.)  Dr.

Gil diagnosed Dale with depressive disorder, moderate in severity, and severe chronic

post-traumatic stress disorder.  (R. at 374.)

Dale saw Dr. Maggie Bishay on October 18, 2010 for a Behavioral Health

Consultation.  (R. at 425.)  Dr. Bishay's notes from that visit indicate that Dale "was

educated about stress and its effects on mood, behavior and health"; that Dale "learned

how to identify stress" and how to implement diaphragmatic breathing techniques to

reduce stress.  (R. at 425.)  Dr. Bishay increased Dale's prescription for Cymbalta.  (R.

at 428.)  Dale also saw Dr. Scott on the same day for a follow-up visit.  (R. at 426.)  Dr.

Scott reported that Dale had missed several appointments due to depression.  (R. at

426.)

On October 19, 2010, Dale had a Mental Residual Functional Capacity

Assessment.  (R. at 390.)  Dr. Donna Hudspeth found that Dale could communicate with

a supervisor and fellow employees, but should not deal with the public.  (R. at 392.)  Dr.

Hudspeth further found that Dale was somewhat dependent but could respond to the

structure of work routine and make ordinary work related decisions.  (R. at 392.)

Dr. Hunter saw Dale on February 4, 2011 for a Behavioral Health Consultation.

(R. at 415.)  Dale reported that she had called her abuser and confronted him but did

not talk about abuse.  (R. at 415.)  Dale discussed regrets about not responding to

romantic interests by her OB/GYN who did her hysterectomy.  (R. at 415.)  Dr. Hunter

diagnosed Dale with common migraine, major depressive disorder, hypertension and back pain.  (R. at 415.)

On the same day, Dale saw Dr. Scott for depression and constipation.  (R. at 417.)  Dale reported no motivation to do anything and stated that she often just stays in bed.  (R. at 417.)  Dale stated that Cymbalta improves her ability to focus and concentrate but does not improve her mood.  (R. at 417.)  Dr. Scott opined that the death of loved ones added stress to Dale's life, adding to her depressed mood.  (R. at 417.)  Dr. Scott stated that positive features of depression included insomnia, fatigue, loss of energy, and impaired concentration/indecisiveness.  (R. at 417.)  Dr. Scott diagnosed Dale with depressive disorder and hypertension.  (R. at 419-20.)

On February 15, 2011, Dale submitted another Disability Report, reporting a worsening of depression symptoms.  (R. at 205.)  She stated that she had excruciating headaches, temporary blindness, trouble sleeping, and an inability to take showers and brush her teeth.  (R. at 205.)  She stated that this change occurred on October 15, 2010.  (R. at 205.)  Dale further reported a lack of focus, and an inability to take care of personal hygiene, do chores, and attend scheduled doctor appointments.  (R. at 208.)

On February 25, 2011, Dale saw Dr. Hunter for a Behavioral Health Consultation to address depression.  (R. at 412.)  Dale still had trouble dealing with past abuse and wondered if she should confront her abuser directly.  (R. at 412.)  Dr. Hunter diagnosed Dale with back pain, hypertension, common migraines, and major depressive disorder.  (R. at 412.)

Dale had an eye exam with Dr. Gary Campbell on March 14, 2011. (R. at 584.) Dr. Campbell diagnosed Dale with myopia, astigmatism, and presbyopia and prescribed glasses and/or contact lenses. (R. at 586.)

Dale saw Dr. Torres for a Behavioral Health Consultation on April 26, 2011. (R. at 583.) Dale reported that she wrote a letter to her abuser and felt some closure with the abuse. (R. at 583.) She also reported that prayer helped her gain closure with the loss of her mother. (R. at 583.) Dr. Torres recommended another follow-up and individual psychotherapy. (R. at 584.)

On May 16, 2011, Dale saw Dr. Scott. (R. at 574.) Dr. Scott diagnosed Dale with Major Depressive Disorder and instructed her to follow-up with psychiatry. (R. at 576.)

Dale saw Dr. Kenneth Berliner on August 2, 2011 for migraine headaches. (R. at 572.) Dr. Berliner opined that her teeth may be exacerbating her headaches and advised Dale to follow-up with a dentist. (R. at 572-73.)

Dale saw Dr. Scott on August 22, 2011 for a regular check-up. Dale continued to report headaches sharp in quality. (R. at 565-66.) Dr. Scott diagnosed Dale with Major depressive disorder and common migraines and told her to follow-up with psychiatry. (R. at 566.)

Dale had an MRI on August 7, 2011, which was normal. (R. at 557.) On August 8, 2011, she had an EEG. (R. at 558.) Dr. Jeffrey Yu found mild diffuse slowing which could be suggestive of a neurophysiological disturbance or consistent with early stages of sleep. (R. at 558.) On August 30, 2011, Dale received a CT scan, which was normal. (R. at 560.)

Dale received a Psychiatric Evaluation on August 31, 2011 from Dr. Megha Chadha. (R. at 605.) At that time, Dale reported depression and worsening symptoms when her mother passed away. (R. at 605.) Dale stated that in 2002 she slipped and fell at work. (R. at 605.) Dale reported that she fell in love with her doctor at the time and did not know how to handle it. (R. at 605.) She also stated that she got a hysterectomy and that afterwards she felt "fear" reminding her of when she was molested by her cousin at age 7. (R. at 605.) Dr. Chadha found that Dale did not suffer from mania, anxiety disorder, or psychotic features. (R. at 605.) Dale also screened negative for PTSD. (R. at 605.)

On October 6, 2011, Dale saw Dr. Chadha to discuss medication management. (R. at 608.) Dale reported that her symptoms had not improved and that she had trouble sleeping. (R. at 609.) Dr. Chadha diagnosed Dale with depression. (R. at 612.)

Dr. Chadha saw Dale again on November 10, 2011, and, at that time, readjusted Dale's medication for Depression. (R. at 613-16.)

## C. Dale's Testimony

In addition to the documentary evidence, the ALJ also considered testimony from Dale, a Vocational Expert and a Medical Expert. Dale testified that she was born on April 12, 1961. (R. at 46.) Dale graduated high school and took some college courses. (R. at 65.) She was once married but is now divorced. (R. at 58.) Dale has four children, three of whom live at home with her. (R. at 54-55.) Her fourth child attends classes at IIT and does not live at home. (R. at 55.) Dale testified that she does not smoke. (R. at 65.) Dale does not have a driver's license. (R. at 67.) She also reported

that she does not have friends, does not socialize with family, does not go to church, to movies or out to dinner.  (R. at 67.)

Dale stated that she last worked April 12, 2009.  (R. at 49.)  At the time, Dale was working in O'Hare Airport's Book Shop as a cashier.  (R. at 49-50.)  At this job, Dale lifted cases of 24 water bottles or sodas cans when she would stock shelves.  (R. at 77.)  Her employer fired her for poor attendance and for calling off work.  (R. at 49.)  Dale testified that she called off work due to her migraines about twice a week.  (R. at 50.)  She stated that she could not move and that if felt like "she was held down in bed" (R. at 50.)  After six months at this job, her employer terminated her.  (R. at 50.)

Dale testified that her headaches lasted one to three days due to her depression.  (R. at 51.)  Dale stated that she would get herself to a point where she could be more upbeat so that she could attend work.  (R. at 51.)  However, Dale stated that it got to a point where she just could not deal with her migraines and depression anymore.  (R. at 52.)  She further stated that there were times where she thought she would be happier if she could die.  (R. at 53-54.)

Dale reported that she does not do household chores; she does not cook, clean dishes, sweep, mop, do laundry, or grocery shop; nor does she sleep, drive, or travel.  (R. at 54; 55; 66.)  Dale stated that her son usually does the grocery shopping.  (R. at 66.)  Dale testified that she takes medication for her headaches and depression but that the mediation does not work.  (R. at 69.)

Dale testified that, on a typical day, she gets out of bed at around 2:00 p.m.  (R. at 66.)  She may get a sandwich or fruit to eat and drink water or juice.  (R. at 66.)  She reported that if no one has cooked in her home, then around 6:00 or 7:00 p.m., she will

get another sandwich.  (R. at 66.)  Dale stated that she spends most of her day in bed.  (R. at 68.)  Dale reported that she does not watch T.V. that much because she cannot stand the noise.  (R. at 67.)  She stated that once every two weeks she watches T.V.  (R. at 67-68.)  Dale testified that she does not have any hobbies, does not do any yard work, but is able to bathe and dress herself.  (R. at 68.)

Dale also stated that she remembers her cousin molesting her at the age of seven.  (R. at 56.)  She testified that her cousin raped her and tried to rape her other times.  (R. at 56.)  Dale stated that she fought back those times.  (R. at 56.)  She stated that her cousin followed her from place to place at a family reunion asking her questions.  (R. at 57.)  She stated that she wondered why her cousin was so inquisitive but realized it was because he was trying to figure out whether Dale remembered the rape.  (R. at 57.)  Dale said that it took her a while to accept the fact that she had been raped and that it was hard for her to cope.  (R. at 56-57.)  Dale testified that she tried not to remember the rape because she did not like feeling the way she felt when the rape occurred.  (R. at  57.)  Dale admitted that these memories affected her relationship with her husband.  (R. at 58.)  She stated that she and her husband were not on the same page sexually when they were married, and that there were times where her husband would coax or force himself upon her.  (R. at 58.)  Dale testified that she is divorced and does not want another relationship.  (R. at 58.)

With regard to her past work experience, Dale testified that she worked for 1 day at a telemarking company.  (R. at 59.)  Before this, she worked as a cashier for a trucking company and her employer fired her because money went missing.  (R. at 59-60.)  Dale testified that she also held a position with UPS sorting packages.  (R. at 61.)

During this job, Dale testified, she suffered a lower back injury on the job, had a Workers' Compensation claim and received disability for at least six months. (R. at 61-62.) Dale was also a customer service representative for a Hollywood Video store where she stocked videotapes back on the shelves. (R. at 62.) Dale stated that she did not generally have to lift anything at this job but that, if she did, it was less than 50 pounds. (R. at 78.) Dale also proofread tax forms for a large company. (R. at 64.) She was fired from this job stating that her supervisor got upset when he found out Dale made more money than he did. (R. at 64.) Lastly, Dale was a gift wrapper for Target Corporation. (R. at 65.)

**D. Vocational Expert's Testimony**

The ALJ also heard testimony from Michelle Peters, a certified licensed rehabilitation counselor who testified as a Vocational Expert ("VE"). (R. at 76-77). The VE described Dale's past work as unskilled to low-end semi-skilled and between light and medium in physical demand. (R. at 78-79.)

The ALJ asked the VE to consider a hypothetical person whose age, education, and work experience were similar to Dale's, who had no exertional limitations, but would be limited to unskilled, simple, routine, and repetitive tasks, and could have no sustained interaction with the general public, "could work in proximity to co-workers, but [not] on joint or shared tasks, and could occasionally interact with supervisors." (R. at 79.) The VE testified that this hypothetical person would not be capable of doing Dale's past work. (R. at 79.) However, she testified that in the Chicago Metropolitan area, for medium physical demand, there were other positions that the hypothetical individual could perform including: 3000 janitorial positions, 2000 packaging positions, and 1800

sorting positions.  (R. at 79-80.)    The VE further testified that, at the light physical

demand level in the Chicago Metropolitan area, there were 1800 janitorial positions,

1500 hand-packaging positions, and 1500 inspection positions.  (R. at 80.)

The VE also testified that, in a given work day, an individual could be off task, at

maximum, 15% of a workday.  (R. at 81.)  The VE testified that an employee who was

off-task for more than this would have diminished opportunities for employment. (R. at

81.)  The VE also testified that, if an individual were absent one to two times a month,

on a consistent basis, she would not be employable. (R. at 81.)

### E.  Medical Expert's Testimony

Finally, the ALJ heard from Dr. Ellen Rozenfeld,  a Licensed Clinical

Psychologist, who testified as a Medical Expert ("ME" or "Dr. Rozenfeld").  (R. at 69.)

Dr. Rozenfeld noted that Dale had been diagnosed with an adjustment disorder, post-

traumatic stress disorder ("PTSD") on an episodic basis, and moderate major

depressive disorder.  (R. at 70.)  She stated that, while different hospital records stated

different things regarding the PTSD, it would be reasonable that Dale would have

symptoms.  (R. at 70.)   The ME noted that it was unclear whether Dale met the full

criteria, however.  (R. at 70.)  Dr. Rozenfeld further stated that Dale's mental status

functions have been consistent and that the depression has been recognized, however

there was no indication of manic or psychotic symptomatology  (R. at 75.)

Dr. Rozenfeld stated that Dale had been in consistent treatment and that the

medical records showed that Dale benefited from treatment and medication. (R. at 70.)

Dr. Rozenfeld also stated that, with regard to Dale's activities of daily living ("ADLs"),

Dale had consistently described a restrictive range in terms of relying on her children for

many things.  (R. at 72.)  However, in the Dr. Rozenfeld's opinion, Dale was capable of

making something simple to eat as reference by the ADL form and Dale's own

testimony of making food.  (R. at 72.)  Further, Dr. Rozenfeld stated that Dale's social

functioning was moderately limited.  (R. at 72.)  The ME further stated that Dale was

more isolative but that she was able to maintain meaningful relationships with family

and had positive relationships with treating sources.  (R. at 72.)  The ME testified that

Dale's concentration, attention, and memory were only mildly limited, and that Dale did

not suffer from episodes of decompensation; she also noted that the C Criteria were not

satisfied.  (R. at 72-73.)

With regard to Dale's work related restrictions, the ME stated that Dale was

cognitively capable of understanding, remembering and carrying out detailed

instructions but that she would recommend limiting Dale to routine instructions and

simple routines.  (R. at 73.)  Further, Dr. Rozenfeld stated that, although Dale could be

around the public, she would not have Dale in a position that required her to sustain

contact with the general public.  (R. at 73.)  (R at 73.)  The ME testified that Dale could

handle contact with a supervisor and proximate contact with co-workers.  (R. at 73.)  Dr.

Rozenfeld recommended limiting Dale to a setting that is more predictable in nature,

where there is normal routine, and where the expectations are known.  (R. at 73.)

**F.  ALJ's Opinion**

The ALJ issued her decision on December 7, 2011, finding Dale to be not

disabled at step five.  (R. at 37-38.)  The decision is discussed in greater detail below,

but, briefly, the ALJ found that Dale could not perform her past relevant work but that

there were jobs that existed in significant numbers in the national economy that Dale

could perform. (R. at 37.)  Dale raises a number of challenges to the decision, and

argues that the ALJ committed several errors in finding her not disabled; she seeks

summary judgment reversing or remanding the matter to the Commissioner.  The

Commissioner seeks summary judgment affirming her decision to deny benefits.

### Discussion

**A.  Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and

free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th

Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v.

Perales*, 402 U.S. 389, 401 (1971)).  We must consider the entire administrative record,

but we will not re-weigh the evidence, resolve conflicts, decide questions of credibility,

or substitute our own judgment for that of the Commissioner. *Lopez v. Barnhart*, 336

F.3d 535, 539 (7th Cir. 2003). We will "conduct a critical review of the evidence" and will

not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate

discussion of the issues." *Id.*  While the ALJ "must build an accurate and logical bridge

from the evidence to [her] conclusion, [she] need not discuss every piece of evidence in

the record". *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must

"sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ

considered the important evidence ... [and to enable] us to trace the path of the ALJ's

reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting

*Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B. Analysis under the Social Security Act**

To be entitled to disability insurance benefits under the Act, a claimant must establish that she is under a disability. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling ('a listing-level impairment'), (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885–86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

At step one, the ALJ found that Dale was not engaged in substantial gainful activity since April 12, 2009, the alleged onset date. (R. at 29.) At step two, the ALJ found that Dale suffered from the following severe impairments: depression, migraine headaches, anxiety disorder, adjustment disorder, and post-traumatic stress disorder. (R. at 29.) At step three, the ALJ found that Dale did not have an impairment or combination of impairments that met or medically equaled the severity of any

impairment that the Commissioner considers to be conclusively disabling.  (R. at 30.)

The ALJ then determined that Dale had the Residual Functional Capacity ("RFC") to

perform a full range of work at all exertional levels but has non-exertional limitations

including:  unskilled, simple, repetitive, routine and predictable tasks; no sustained

interaction with the general public; can work in proximity to coworkers but not on joint or

shared tasks; and occasional interaction with supervisors.  (R. at 32.)  At step four, the

ALJ found that Dale could not perform any past relevant work.  (R. at 36.)  At step five,

the ALJ found that Dale was capable of performing other jobs existing in significant

numbers in the national economy.  (R. at 37.)  Therefore, the ALJ concluded that Dale

was not disabled  under the Act.  (R. at 38.)

Dale argues that the ALJ erred in determining her RFC, in analyzing the medical

opinion evidence, and in assessing her credibility.  The Court considers each argument

in turn.

### C.  The ALJ's RFC Determination

The ALJ found that Dale had the RFC to perform a full range of work at all

exertional levels but had non-exertional limitations including:  unskilled, simple,

repetitive, routine and predictable tasks; no sustained interaction with the general

public; can work in proximity to coworkers but not on joint or shared tasks; and

occasional interaction with supervisors.  (R. at 32.)  Dale argues that the ALJ failed to

construct a logical bridge between the evidence and the RFC by failing to address the

medical evidence pertaining to Dale's obesity and medication side effects.  The

Commissioner argues that Dale did not claim that obesity adversely affected her

functional capacity, let alone explain how obesity prevented her from working, either in

her initial application for benefits or at the administrative hearing. The Court agrees with the Commissioner.

The ALJ found that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However the ALJ also found that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the above residual functional capacity assessment. Dale offered no evidence (no medical records, no testimony, no representation in her application for benefits) to suggest or establish that her obesity prevented her from working; nor did she offer any evidence to suggest or establish that side effects from her medication affected her ability to work. Nor does Dale point to any evidence that suggests her obesity exacerbated her physical conditions. In fact, as the record shows, Dale's attorney asked Dale if there were any side effects from the medication. (R. at 68.) And Dale responded "sweating and dry-mouth"... "That's all I can think of right now, but I know it's more than that." (R. at 68.) That was the extent of the testimony and Dale did not offer any more insight into any side effects. Further, no medical records or opinions indicate that these side effects exacerbated her physical conditions. Therefore, the ALJ's lack of analysis regarding this issue is understandable.

It is also harmless error that the ALJ did not explicity address Dale's obesity. Dale argues that her case must be remanded because the ALJ failed to indicate whether her obesity resulted in limitations. But no physician ever suggested, either implicitly or explicitly, that Dale's obesity was exacerbating her physical impairments. *Prochaska v. Barnhart*, 454 F.3d 731, 736–737 (7th Cir. 2006) (failure to explicitly

consider the effects of obesity may be harmless error where the ALJ implicitly considers the doctors' reports who were aware of the claimant's condition).  While the medical records contained diagnoses of obesity, no treating physician ever mentioned her obesity as a contributing factor; Dale never testified that her obesity affected her ability to work or her activities of daily living and neither did the medical expert who testified before the ALJ.  Consequently, there really was nothing for the ALJ to consider on the issue.

The ALJ took into consideration a disability report, Dale's own testimony, and voluminous medical records in assessing Dale's RFC.  (R. 32-35.)  The ALJ fully assessed Dale's testimony in tandem with the appropriate medical records.  As such, the ALJ found that Dale's medically determinable impairments could reasonably be expected to cause the alleged symptoms but Dale's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the above RFC assessment.  The ALJ emphasized the numerous medical records showing that Dale improved when she was compliant with treatment, as well as the medical records showing an exacerbation of symptoms when Dale was non-compliant with treatment.  These records support the ALJ's RFC assessment.

**D.  The ALJ's Evaluation of Dr. Hansen's Medical Opinion**

Next, Dale contends that the ALJ failed to properly assess the opinions offered by Dr. Hansen.  We disagree. In assessing the medical records and opinions, the ALJ considered medical opinions from three sources:  the medical expert present at the hearing (Dr. Rozenfeld), the state agency medical consultant (Dr. Donna Hudspeth),

and Dale's treating psychologist (Dr. Michael Hunter Hansen) (R. 35-36.)  Dr. Hansen opined that Dale's mental impairments caused slight restrictions of ADLs, marked difficulties in maintaining social functioning, deficiencies of concentration, persistence, or pace on a seldom basis and one or two episodes of decompensation.  The ALJ gave partial weight to Dr. Hansen's opinion by agreeing with his assessment with regard to Dale's limitations of ADLs and concentration, persistence, or pace.  However, the ALJ found no evidence of a marked limitation with regard to claimant's social functioning; nor did the ALJ find evidence in the medical records for an episode of decompensation of an extended duration.

In this case, the ALJ properly considered the factors set forth in 20 C.F.R. § 404.1527(d) and explained why she gave more credit to Dr. Rozenfeld's opinion.  Moreover, the ALJ is responsible for evaluating all of the medical opinions, determining the weight to give each opinion, and resolving any conflicts.  *Diaz*, 55 F.3d at 306, n. 2.  The ALJ did just that and we see no reason to remand on this issue.  The ALJ looked to the other medical opinions, the disability report, other medical records and Dale's own testimony.  (R. at 32-35.)

Dr. Rozenfeld opined that the medical record did not establish that Dale's impairments, individually or in combination, met or equaled the severity of impairments contained in the regulations stated by the Act.  (R. at 35; 70-73.)  Dr. Hudspeth and Dr. Hansen both opined that Dale had mild restriction of activities to daily living, difficulty in maintaining social functioning, and that Dale was somewhat dependent but could respond to work routine and make ordinary decisions.  (R. at 390-392; 533, 537.)

The ALJ explained that she gave great weigh to Dr. Rozenfeld's opinion because Dr. Rozenfeld was impartial, and her assessment was informed, consistent with the medical evidence of record and consistent with the record as a whole. (R. at 35.) The ALJ explained that she gave partial weight to the assessment of Dr. Hudspeth. (R. at 36.) The ALJ found the record, subjective reports of the claimant, medical evidence at the hearing and the more credible assessment by Dr. Rozenfeld to objectively show Dale's mental impairments caused a moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. (R. at 36.)

Furthermore, the ALJ looked to the records (R. at 386) from Dr. Donna Hudspeth, which showed that Plaintiff suffered from *mild* limitations concerning social functioning. (*emphasis added.*) In the same report, Dr. Hudspeth noted decompensation, but there was no evidence in the medical records to establish that it was of an extended duration. Dr. Hudspeth also noted that Dale was only partially credible. (R. at 388.) The ALJ found the same to be true. The ALJ stated that Dr. Hansen's opinion was sympathetic, poorly supported, inconsistent with the medical records and inconsistent with the record as a whole. (R. at 36.) The ALJ in this case did not improperly substitute her judgment for that of Dr. Hansen. Rather, the ALJ made a logical conclusion given the apparent disconnect between Dr. Hansen's own opinion and the objective medical evidence. The ALJ reasonably believed that the physician's assessment could have been influenced by a desire to help Dale get disability benefits.

Accordingly, the Court will not second-guess the ALJ's decision to give less weight to Dr. Hansen's opinions and greater weight to the impartial medical expert's opinion when making her RFC findings.

## F. The ALJ's Credibility Determination

Finally, Dale argues that the ALJ erred in assessing her credibility. To succeed on this ground, Dale must overcome the highly deferential standard that we accord to the ALJ's credibility determination. Because the ALJ is in a far superior position to assess the credibility of a witness, we will only reverse the ALJ's credibility finding if it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding that the credibility determinations of hearing officers are afforded special deference).

Dale argues that the ALJ failed to comply with the requirements of SSR 96–7p. We disagree. In assessing Dale's credibility, the ALJ first determined whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms (there was). Once this is shown, the ALJ must then evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. If the intensity, persistence or functionally limiting effects of pain or symptoms are not substantiated by objective medical evidence, then the ALJ must make a finding on the credibility of the statements based on the entire medical record.

Here, the ALJ based her credibility determination on a number of facts and observations. The ALJ noted a number of discrepancies between Dale's testimony and the medical records. For example, Dale testified at the hearing that she could not perform most household chores and also stated the same in her disability report (R. at

54; 55; 66; 208) but testified at the hearing that she went grocery shopping with her son for items needed for Thanksgiving and is capable of making sandwiches for herself (R. at 33; 66); she also stated in her disability report that she sometimes did the dishes, paid the bills, and handled a savings and checking account.  (R. at 373.)  Further, Dale testified at the hearing that she stayed home and did not partake in hardly any activities of daily living; but in the September 2010 Function Report she stated she left her house on an occasional basis and could travel by walking and public transportation.  (R. at 35; 191-96.)  In fact, Dale testified that she traveled by public transportation to attend the hearing.  (R. at 55-56.)  Also, Dale testified to the ALJ that she had no hobbies and does not watch T.V. because she cannot stand the noise (R. at 67-68), but she reported on that same Function Report form that she watched television and played computers games on a daily basis.  (R. at 35, 191-96.)

The ALJ determined that these general inconsistencies showed that Dale's allegations were not entirely credible because they were inconsistent with her course of treatment and activities of daily living.  (R. at 35.)   Further, the ALJ found the medical records to demonstrate significant improvement with compliance to routine treatment.  (R. at 33.)  The ALJ paralleled this to medical records showing that when Dale departed from treatment, Dale's conditions declined.  (R. at 33-35.)  However, when Dale resumed recommended treatments, medical records showed a significant improvement.  Additionally, all diagnostic tests relating to Dale's migraines showed findings generally within normal limits.  (R. at 35.)

The ALJ also explained that she gave partial weight to the assessment of Dr. Hansen.  The ALJ stated that, while she agreed with Dr. Hansen's assessment with

regard to Dale's limitations relating to activities of daily living and concentration, persistence, or pace, the ALJ did not find any evidence of marked limitations with regard to Dale's social functioning.  (R. at 36.)  The ALJ stated that Dr. Hansen's opinion was sympathetic, poorly supported, inconsistent with the medical records and inconsistent with the record as a whole.  (R. at 36.)

Based on the foregoing, the Court finds that the facts and observations noted by the ALJ provide support for her credibility determination.  In short, the ALJ's credibility determination was not patently wrong, and we will not remand on this basis.  *Powers*, 207 F.3d at 435; see also*, Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993) (recognizing that a reviewing court should not reconsider credibility determinations made by the ALJ as long as they find some support in the record).

## CONCLUSION

For the reasons set forth above, Dale's motion for summary judgment [19] is denied and the Commissioner's motion for summary judgment [23] is granted. The decision of the ALJ is affirmed.  It is so ordered.

Dated:  April 29, 2014

ENTERED:

/s/Michael T. Mason
MICHAEL T. MASON
United States Magistrate Judge